WESTINGHOUSE ELECTRIC & MFG. CO. v. SUTTER et al.

(Circuit Court, W. D. Pennsylvania. February 21, 1912.)

No. 3.

1. PATENTS (§ 327*)—SUIT FOR INFRINGEMENT—EFFECT OF PRIOR DECISIONS.
    Where a court is in doubt as to the correctness of its own views upon the question of the validity of a patent which has been adjudicated in other circuits, the rule of comity applies, and it should follow the prior decisions.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 620-625; Dec. Dig. § 327.*]

2. PATENTS (§ 328*)—INFRINGEMENT—ELECTRICAL TRANSFORMER.
    The Stanley patent, No. 469,809, for a system of electrical distribution, construed, and *held* not infringed.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against Frederick C. Sutter and others, trading as the Pittsburgh Transformer Company. On final hearing. Decree for defendants.

Gifford & Bull, for Westinghouse Electric & Mfg. Co.

Clifton V. Edwards and S. S. & C. B. Mehard, for the Pittsburgh Transformer Co.

ORR, District Judge. This patent case is before the court upon final hearing. Since the bill was filed the patent has expired. Therefore no relief is sought except compensation for infringement. Before granting relief, the court must be fully satisfied that the patent was valid, and that the defendant infringed. No other questions have been raised.

The patent was issued to William Stanley, Jr., by the United States on March 1, 1892, was numbered 469,809, and was for a "system of electrical distribution." It relates to alternating current transformers or converters. A transformer having no moving part is structurally very simple. It consists of an iron core, about which are wound two separate unconnected coils of wire; one connected with the dynamo called the "primary coil," the other connected with the lamps called the "secondary coil." Its utility is in its power to transform an electric current of high tension to one of such low degree as to be reasonably safe for domestic use. The transformer was old in the art at the date of the Stanley patent. To make it self-regulating had been the aim of inventors for some time prior to that date. What they hoped to produce was a transformer which would cause a fixed amount of light in each used lamp connected with the secondary wire, no matter how many lamps thus connected were in use. Dimness in the lamps as more were lighted was then the undesirable feature of the existing transformers. It is insisted by the complainant that Stanley made the discovery that the trouble was due to an improper length of wire on the primary core. In his patent Stanley says:

"This should be of such length that reacting self-inductively upon its own magnetic circuit the average counter-potential so produced approximately equals the potential applied to the primary circuit. When so constructed, an ammeter will practically show no current when the secondary circuit is open. To obtain these results in practice I use the following method: I first choose the percentage of efficiency to be obtained. Then having selected a type of magnetic current affording as great magnetic conductivity as possible, I apply such a length of primary conductor that acting self-inductively upon its core the difference of the counter-potential and applied potential multiplied by the current in the converter shall equal the predetermined loss of energy inevitable in conversion and vary the length of primary wire until the desired results are obtained."

The claims of the patent in issue are as follows:

"1. In a system of electrical distribution, and in combination, an alternating current dynamo and converters electrically connected with the main-line

conductors in multiple arc and organized to transform the current in the main conductors into currents of less potential and greater quantity in the secondaries, each converter made with a primary coil containing such length of wire exposed to magneto-electric induction that when operated by the dynamo with which it is to be used with its secondary current open the electrical pressure and counter-pressure in its primary circuit shall be equal with incandescent lamps or other translating devices in the secondary circuits, substantially as and for the purposes set forth."

"3. In a system of electrical distribution and in combination, an alternating current-dynamo and converters organized to transform the current generated by the dynamo into currents of less potential and greater quantity at or near the points of consumption electrically connected with the main-line conductors in multiple arc and having their primary circuits constantly closed, each converter adapted to the dynamo operating the system by making its primary coil of such length that when supplied with its full proportionate share of the entire normal electro-motive force of the machine, its secondary circuit being open, the electrical pressure and counter-pressure in its primary circuit shall be approximately equal with translating devices in the secondary circuits of the converters to be cut out of the circuit when not in use without the introduction of any resistance in the place of them, substantially as and for the purposes set forth."

In each of the claims the most important element is such length of wire in the primary coil, etc. Those courts which have sustained the patent have held that its essential feature is the disclosure of the length of the primary wire. They have all assumed or found that a definite length of primary wire was necessary in order that a transformer should produce the desired result.

In Westinghouse Electric & Mfg. Co. v. Saranac Lake Electric Light Co. (C. C.) 108 Fed. 221, page 226, Judge Coxe says:

"He discovered that he could remedy existing evils by regulating the length of the wire on the primary coil of the transformer. The patent tells those skilled in the art, how to accomplish this result. To the uninitiated, Stanley's rule seems indefinite and obscure, but electricians have no difficulty in understanding it. He determines the correct length of the primary coil," etc.

In the same case (113 Fed. 884, page 886, 51 C. C. A. 514, at page 516), Judge Lacombe, speaking for the Court of Appeals for the Second Circuit, said:

"Stanley suggested that the difficulty was due to an improper length of wire on the primary, and among much else he states precisely, specifically, and exactly what that length should be. The amount of wire for a given character of current supply cannot be stated in feet and inches, because it is, to some extent, dependent upon other things, such as the quality of iron employed in the core, the quality of copper used in the coils, the shape of the transformer, and the way the coils are applied. The Stanley patent, recognizing these variable elements, gives a rule applicable to all conditions."

While these excerpts from the opinions in that case would indicate that Stanley's invention lay in "a certain length of primary winding," it was thought by some that the opinions found the real essence of the invention to be the Stanley rule for arriving at such length. This was the view of Judge Colt in the First Circuit in Westinghouse Electric & Mfg. Co. v. Stanley Electric Mfg. Co. (C. C.) 117 Fed. 309. Therefore he refused an injunction because it was conceded that the defendant's apparatus was not made by the Stanley rule. Subsequently, in the Second Circuit it was from time to time specially emphasized that the essence of the invention was the length of primary coil. In

Westinghouse Electric & Mfg. Co. v. Montgomery Elec. L. & P. Co. (C. C.) 131 Fed. 86, Judge Coxe says:

"The essence of the invention is the length of the wire on the primary coil and not the instrument or method by which that length is determined."

In the same case, 153 Fed. 890, 82 C. C. A. 636, the Court of Appeals of that circuit, by Judge Townsend held that claims 1 and 3 of the patent cover combinations in which the length of the primary wire is the same substantially as would result from following the Stanley rule.

[1] In the case at bar it was insisted by the plaintiff that this court was bound by the construction given to the patent by the courts of the Second Circuit, and expert evidence was introduced to explain certain language in some of the opinions. If the phenomena of electricity and its laws had ceased to be in dispute at the date of the patent, if the art was not obscure to those most intimate with it, there would be great force in the position that this court for reasons of comity should adopt the conclusions reached elsewhere. It may well be doubted that any court to-day would reach the same conclusions under the evidence offered in the case. However, because the patent has expired, and an injunction is not sought and because the fact of infringement is not found, the question of the validity of the patent need not enter into this case, but may rest as determined by the courts of the Second Circuit. Indeed, comity is applicable because this court doubts the soundness of its own views of the question of validity. Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856.

Before considering defendant's transformer in the light of the patent, the relations of the parties to this action may be considered. The defendants are the largest independent competitors of the plaintiff in the manufacture of transformers, and have their plant in the city of Pittsburgh about 15 miles from the plant of the plaintiff, which is in the borough of East Pittsburgh. In 1902 plaintiff gave defendant notice of the infringement. In 1908 the bill was filed. On the day the bill was filed a representative of plaintiff visited the electric lighting plant of the Borough of Pitcairn, not far from plaintiff's works, and found in use 11 transformers made by the defendant and 6 made by plaintiff. That plaintiff should have delayed suit so long in the face of such competition indicates that plaintiff had some doubt of defendant's infringement. It is true that a plaintiff's delay is often excused where litigation is in progress in another forum. But the prosecution of suits against users of infringing apparatus, not made by the defendant in the case at bar, in other jurisdictions, coupled with a neglect to sue the largest independent competing manufacturer whose plant and activities are near those of the plaintiff, is a circumstance from which the inference may be drawn that infringement by defendant could not have been shown without difficulty.

[2] The evidence introduced by both sides is great in bulk, most of it being expert testimony of a technical and scientific nature. Hypothetical questions are answered by experts of perhaps equal qualifications in very different ways. Repeated study of the propositions

urged on the part of the plaintiff has failed to convince the court that they have sufficient merit to justify a finding for plaintiff. It is clearly shown that the transformers of defendant are self-regulating, and that in this respect they are like the transformers held to have infringed in the other litigation. That similarity of result may be produced by apparatus of different kinds is a matter of such frequent observation that a mere statement thereof without illustration is sufficient.

It was not made to appear satisfactorily that defendants use the Stanley rule in the construction of their transformers. Many pages of testimony are introduced as to whether in defendants' primary wire there was any difference between the applied potential and the counter potential. Of course, if the difference be o, then the product of such difference and the current as contemplated by the Stanley rule will be o also. Experiments were made by plaintiff's experts and as well by defendants' experts, and were confidently relied upon as settling the question. The former were not made by the use of different lengths of primary wire, but were made by the use of a uniform length of wire, and by repeatedly changed and increased voltage. The latter were made with varied lengths of primary wire and by uniform applied voltage. The former observed a difference between the counter and applied potentials, while the latter did not. The evidence in .respect to the latter is more satisfactory, and, when considered with the offer of the defendants to repeat their experiments in the presence of representatives of plaintiff and their declination of such offer, should be considered as convincing. The results of their tests show that with a primary potential of 2,200 volts the counter potential was also 2,200 volts, whether there were 760 or 1,800 turns of primary wire or some intermediate number, and that self-regulation did not cease at any number of turns. The conclusion seems to follow that defendants' transformer is self-regulating without respect to the number of turns of primary wire. If defendants' length of primary wire be not ascertained by the Stanley rule, or be not such as would be arrived at by the use of the rule, then under the decisions above cited infringement cannot be found. Judge Lacombe, in Westinghouse, etc., Co. v. Orange County Gas & Elec. Co. (C. C.) 119 Fed. 365, refused a motion for a preliminary injunction because:

"It cannot be held that the length of wire in primary coil is substantially the same as it would be if such length were determined by the Stanley rule. If it be not substantially the same, we seem to have the very exception suggested in the opinion of the Court of Appeals—'some other length covered by the language of the claim, but not of the rule and infringement is not shown.'"

There are two general types of transformers, called the "core type" and the "shell type." In the former the coils mainly surround the iron, in the latter the iron mainly surrounds the coils. Defendants' transformer is of the former type. All transformers which were the subject of former litigation with respect to the Stanley patent, so far as appears, were of the latter type. The plaintiff has not satisfied the court that there may not be a different magnetic relation between coils and core in the one from that in the other, or a difference

between the electrical or magnetic conditions in each.    Hypothesis without test does not answer.

This case is one where the absence of actual fact proof is not met by expert speculations.    The plaintiff has not sustained the burden which rests upon it.    Its evidence of infringement by defendants is not sufficient.

Its bill must be dismissed, with costs to the defendants.    Let a decree be drawn.