## JAY et al. v. SUETTER et al.

Circuit Court of Appeals, Ninth Circuit. June 3, 1929.

No. 5780.

Winter & Maguire and Loyal H. McCarthy, all of Portland, Or., for appellants.

George L. Wilkinson and Charles S. Burton, both of Chicago, Ill., and Dey, Hampson & Nelson, of Portland, Or., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge. The plaintiffs below, Webb Jay and Stewart-Warner Speedometer Corporation, are respectively the owner of and exclusive licensee under patent No. 1,132,273, granted to Jay March 16, 1915. The patent is for what is commonly known as a vacuum tank fuel feed for automobiles. The complaint alleges infringement thereof, particularly of claims 9 and 14, by the defendants, in their manufacture and sale of what is referred to as the Simplex vacuum feed covered by patent No. 1,662,282, issued March 13, 1928. From an interlocutory decree adjudging the validity of plaintiffs' patent and its infringement, and directing an accounting, defendants appeal.

█ As distinguished from gravity and pressure systems, the vacuum feed consists of means by which the gasoline is drawn by suction from the main tank, generally carried at the rear end of the car, to a small supply tank located near to and higher than the carburetor, from which under divers controls it flows uniformly and continuously to the

carburetor and combustion chambers. The problem has been so clearly stated and the Jay device so fully and fairly explained by published decisions that elaborate description is thought to be unnecessary. See Jay v. Weinberg (D. C.) 250 F. 469, affirmed on appeal (C. C. A.) 262 F. 973, and Sparks-Withington Co. v. Jay (C. C. A.) 270 F. 449, affirming (D. C.) 258 F. 45. In essence the invention resides in the combination of elements in and connected with the small supply or vacuum tank which, to use the concise language of the court below, has "two chambers, separated by a partition, with passage leading from the upper to the lower chamber controlled by a check valve operatively opened by gravity flow of the liquid. The upper chamber is connected with the fuel supply and with the manifold of the engine, and also has an atmospheric connection. There is in it a float operatively connected with valves controlling the suction from the manifold, and the atmospheric opening, so that when a vacuum is created therein and a predetermined quantity of fuel has been lifted into it, the float will close the suction and open the atmospheric valve so as to permit the fuel to flow therefrom past the check valve into the lower chamber of the engine. When the consumption of fuel by the engine has lowered the level in the upper chamber to a predetermined degree the float is lowered sufficiently to unseat the suction-controlling valve and set the atmospheric valve, producing a vacuum therein, and lifting the fuel from the main fuel tank into the upper chamber."

In the decisions above cited, as well as in the more recent case of Jay v. Ireland & Matthews Mfg. Co. (D. C.) 280 F. 166, claims 9 and 14 of the plaintiffs' patent were held valid. These decisions are well considered and the reasoning is for the most part highly persuasive, two of them are by courts of co-ordinate jurisdiction, and in point of neither fact nor law does the record before us exhibit anything new of substance. Without discussion, therefore, we hold the claims to be valid. Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 S. Ct. 708, 44 L. Ed. 856; Cookingham v. Warren Bros. Co. (C. C. A.) 3 F.(2d) 899. Indeed, while defendants do not concede that these cases were rightly decided and challenge the validity of the patent, the contention they more elaborately and earnestly press is that in view of the prior art, as recognized in the decisions and exhibited by the instant record, if the Jay patent is not void for anticipation, at least its claims must be restricted to a narrow range, and, so restricted, they are not infringed by the Simplex feed.

As technically stated, the claims are as follows:

"9. The combination with an explosive engine of a fuel supply tank located below the plane of the engine intake; a fuel supply receptacle located in a plane above that of said tank; a conduit leading from said tank to said supply receptacle; an auxiliary receptacle into which fuel flows from said supply receptacle; a conduit for supplying fuel from said auxiliary receptacle to the engine; exhaust means for reducing the pressure in said supply receptacle below that of the atmosphere; means for alternately connecting said supply receptacle with the exhaust means and with the atmosphere, and means controlling communication between said liquid supply receptacle and said auxiliary receptacle, adapted to be opened by a gravity flow from said supply to said auxiliary receptacle."

"14. In combination with a main low-level liquid supply tank; a liquid supply receptacle located in a plane above said tank; and auxiliary receptacle into which the liquid flows from said first receptacle; a conduit leading from the auxiliary receptacle for discharge by gravity therefrom; means for producing a partial vacuum in said first receptacle; means for alternately connecting said first receptacle with said exhausting means and with the atmosphere; a check valve which controls the communication between said first mentioned receptacle and said auxiliary receptacle, opening by pressure of the liquid in the first mentioned receptacle, and a pipe communicating with said auxiliary receptacle and extending to a point above the high liquid level in the first receptacle and open to atmospheric pressure, for maintaining atmospheric pressure in said supplemental receptacle."

Undoubtedly these claims may be fully read upon the Simplex with the possible exception of the means for controlling the flow of the liquid from the upper to the lower chamber of the tank. It will be noted that in claim 9 the upper chamber is designated as the "supply receptacle" and the lower chamber as "an auxiliary receptacle," and the element in question is described as "means for controlling communication" between the two "adapted to be opened by a gravity flow from the one to the other." In claim 14 this means is referred to as a "check valve * * * opening by pressure of the liquid in the" supply receptacle. In the commercial form of plaintiffs' device the communicating duct, upon entering the lower chamber, is turned

from a vertical to a horizontal position so that the liquid discharges laterally and the terminating edge of the duct is within a vertical plane. Being pivoted or hinged to the upper wall of the duct at its end, the valve in the absence of pressure swings into place or lightly seats by gravity; and of course greater pressure in the lower chamber than in the upper tends more firmly to seat it and effectually to cut off connection between the two chambers. Upon the other hand, when, in operation, suction into the upper tank ceases and air is admitted, by gravity the liquid therein opens the valve and flows into the lower chamber. In defendants' device the discharge of the liquid into the lower chamber is downward through a straight vertical duct within which is an unattached disc (or, more efficiently, a conical) valve moving vertically to and from its seat. As in plaintiffs' device, in the course of operation it is engaged by being pressed upward against its seat by atmospheric pressure in the lower chamber, when, by means of suction, a vacuum is created in the upper chamber. Upon the resumption of atmospheric pressure in the upper chamber, the valve moves downward, and thus the duct is opened for the flow of the liquid to the lower chamber. Counsel differ and the experts were at variance upon the question whether or not the valve falls from its seat of its own weight or is forced down by the weight of the liquid column. Not being specially learned in the science of physics, perhaps we should not venture to act upon our own judgment; but we do not deem it necessary to decide to which of the expert opinions should be accorded the greater weight. So far as concerns the present issue the question is thought to be one of casuistry only, and not of substance. So long as there is a vacuum in the upper chamber undoubtedly the liquid rests upon and tends to unseat the valve. That condition continues until upon the opening of the air valve the weight of the liquid supplemented by the pressure of the inflowing air exceeds the atmospheric pressure in the lower chamber, when the liquid and valve go down together. We are satisfied that practically speaking at no instant is there an interval of space between the valve and the liquid column. Defendants' theory rests upon the assumption that the valve material is of higher specific gravity than the liquid, and therefore under the physical law applicable to bodies falling through the air or other medium, it will fall with greater velocity than the liquid. Apparently they fail to take into account the fact that the valve is a disc necessarily going down flatwise and thus

meeting a relatively great atmospheric resistance, or the possible frictional obstruction due to contact with the walls of the duct. But however that may be, we are not impressed with the contention that where it would be infringement to use a valve of low specific gravity defendants can escape infringement by employing a like valve of high specific gravity, there being no functional difference. And there is no contention that a valve of low specific gravity would not operate in the same way and with the same efficiency as one of high specific gravity.

As already suggested, the patent in suit is for a combination and neither party rests any argument upon the difference in type of the two valves employed. Both valves are common and well-known forms of check valves, and, as was said by the court below, "open by gravity in the direction of the flow of the fuel. They perform the same function in substantially the same way, and accomplish the same result, and therefore in the sense of the patent law are the same thing." While Jay's invention cannot be accorded a broad scope, it constituted a distinct advance in the art, entitling him to a reasonable range of equivalents. "Where a combination patent makes a distinct advance in the art to which it relates, as does the appellant's invention here, the term 'mechanical equivalent' should have a reasonably broad and generous interpretation." Smith Cannery Mach. Co. v. Seattle-Astoria Iron Works (C. C. A.) 261 F. 85. "We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided." Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 568, 18 S. Ct. 707, 722 (42 L. Ed. 1136). See also Hoyt v. Horne, 145 U. S. 302, 308, 12 S. Ct. 922, 36 L. Ed. 713; Kings County Raisin & Fruit Co. v. U. S. Consol. Seeding Raisin Co. (C. C. A.) 182 F. 59; Los Angeles Lime Co. v. Nye (C. C. A.) 270 F. 155; Metallic Extraction Co. v. Brown (C. C. A.) 104 F. 345.

Though sustaining the validity of plaintiff's patent in the Weinberg Case, 250 F. 469, Judge Sanborn held that it was not infringed by the Weinberg device, and pointed out as one of the differentiating features the normally open check valve in the latter. And defendants argue that if that distinction operated to avoid infringement there, the fact that their valve is normally open should by parity of reasoning be held equally effectual here. Just what significance Judge Sanborn attached to this distinction is not made clear. Apparently he regarded as of controlling importance another feature of the Weinberg

device, referred to as the "closed system." While in a sense the Simplex check valve is normally open, its opening is not followed with the results attributable to the opening of the Weinberg valve. Referring to the latter, defendants' expert, upon cross-examination, testified:

"Q. Now assuming that the gasoline has all fallen, or all passed from the upper chamber down into the lower chamber, and the automobile is not running, so there is no suction on it, this valve would hang open, so if there was an expansion of gasoline in the lower chamber due to heat, that expansion could be relieved by an upper passage of vapor through that normally open valve into the upper chamber, could it not? A. Yes, that is right.

"Q. That of course could never occur with the Simplex? A. Could never occur with the Simplex, nor with the Webb Jay."

Upon the whole we are persuaded that the lower court was right in holding the claims infringed, and therefore the decree will be affirmed.